Good morning. May it please the Court, I'm Christopher Stender on behalf of Surrender Pal, and I'd like to reserve two minutes of my argument for rebuttal. Our first issue for review is whether substantial evidence supported the immigration judge's adverse credibility finding. Looking at the immigration judge's decision, we would argue that it doesn't. But the issues that the immigration judge looked at, whether or not the petitioner was arrested putting up posters or during a meeting, says really nothing about the basis of his fear, and thus doesn't have any bearing on his credibility. The judge also looked at the date that the petitioner broke his finger, whether it was 1987 or 1990, also his date of departure from India, difference of months. None of these issues really goes to the heart of the petitioner's claim for asylum. And whether he was taken to a torture center or not. Well, I think the torture center certainly could have been descriptive. I mean, he was possibly tortured at a police station. Now, he describes it as a torture center, a police station. I don't think that really goes to something that's specifically an inconsistency in the petitioner's testimony. But doesn't he say at first that it was for a month, and then later it's not at a torture center, and it's only several days? Which, you know, I think arguably could be very significant and go just drive a stake right into the heart of things. I think that's a very fair point. But I think there's something kind of that precedes it. And if you look at what happened in this case, there's an original declaration. And on page 145 of the certified administrative record, the government counsel, Ms. Wong, objects to that original declaration for four reasons. She kind of perceives that this is a problem. She says, first of all, it's in English, there's no translation. Secondly, she goes, there's no signature of the petitioner on it. She goes, there's no evidence of who it belongs to and whether or not the petitioner wrote it. For those reasons, she objects to the admission of it. And the immigration judge says, well, it was included with the referral from the asylum office, so I'm going to include it in the record of proceeding. But yet he uses that original declaration of the immigration judge later in order to basically say this is why he's inconsistent, this is why it's not true, any of his testimony, and looks at those four or five different little reasons. Those, I think, they're really minor issues. Well, but also your client claims that the first declaration was the product of an unscrupulous preparer. But what I'm struggling with here, Mr. Stender, is how do we reconcile the allegation that Mr. Paul's first declaration was the work of an unscrupulous preparer with the assurances of his counsel that his second declaration contained, quote-unquote, just grammatical and technical corrections? So that, you know, that kind of gives me pause. I understand, Your Honor, and again, I don't know what was in counsel's mind when he said that, because if you look at the two declarations, there are substantial differences, but the question is, you know, did the petitioner own that declaration? I think clearly what was meant and what the Court should consider and what the immigration judge should have considered was the second declaration, which was sworn, which was translated, there are some changes to it that I don't think are grammatical, that are just, as you've already pointed out, there are some inconsistencies. But I think the petitioner's exact words regarding the initial preparer, the unscrupulous preparer is that the preparer, quote, wrote somewhat of a different story in some parts of it. And I think that's really what you have, and that's what the immigration judge kind of seized on and said, well, these are things that really are not in the original declaration, and what the immigration judge says, he should have corrected them right away. He waited too long, but yet, this application was pending with the asylum office for 10 years before they even set an interview with it, and then more years passed until he ended up in immigration. At what point did he first have counsel? I'd have to double-check the record, Your Honor. I think it's at his second hearing in immigration court. I think there was an original counsel, then there's a subsequent counsel that takes it through to the hearing. Were the changes made before or after he had counsel? We outlined it in the brief. The immigration, were the changes made after he had counsel? There's some small changes made to the original declaration when the second counsel comes in, and that was put on the record, and then at a subsequent hearing, the subsequent counsel makes the wholesale changes with the sworn declaration, and there's a lot of changes in that second declaration. Well, admittedly, the government doesn't ever move with great speed and alacrity, but these are the type of cases, too, that I don't think commissioners are in any hurry to get them resolved. But that being said, you know, part of the backdrop of this is that you have a situation where your client is also claiming a due process violation, and it, you know, on the one hand, I mean, we see a lot of these immigration cases, it sort of seems that the immigration judge had the patience of Job with your client in terms of every time he didn't feel well, you know, he would give him a continuance, or what do you mean you don't feel like you can continue to testify? I mean, you know, anyone can get, breaks into a sweat when they're being cross-examinationed, and he just could call a quit to things, and then at the end he said, look, I'm not going to get, he got a whole bunch of continuances, but I'm not going to give you any more unless you get some letter from your doctor that says you can't testify. So I'm having difficulty seeing how that could be a due process violation when it seems your client was given many, many opportunities. Well, I, it's not unreasonable what the Court is saying. I would point out that three of the hearings took place in the span of, I think, two weeks. So while it looked like there were many, many, many continuances, the time period really is very, very short. So I think that's important. But I think legally, and what we think is the due process violation, is the immigration judge says, well, look, you didn't ask for this, you chose not to explain the inconsistencies. That's, I think, the thrust of our argument regarding why it was unfair for the immigration judge to say, you chose not to explain these inconsistencies. Well, but when you choose not to undergo further, I mean, how does the government, when someone says, I can't testify anymore, I don't feel good, what are they supposed to do, yank someone out of their chair and throw them up into the, you know, cross-examination seat? Well, I mean, was the immigration judge unreasonable in giving the amount of continuances and not? I think that's up for debate. But I think what is wrong is that the judge found that the Petitioner chose not to explain the inconsistencies, and on that basis. Well, I suppose the argument would be he didn't have the opportunity because of the illness, because he, and again, I wasn't there and I don't know exactly how it happened. No, that's a judgment. It's at most, it seems to me, a judgment call as to whether or not you're going to give another continuance in order to give somebody a chance to explain something that he hasn't yet explained. Well, I certainly, I mean, can I imagine other ways to have handled this? Yes, perhaps there could have been. Yeah, but the question is whether or not he had to handle it a different way. Right. I mean, again, I can imagine a way. I mean, they could have, counsel could have offered, look, can we have, like, interrogatories, can we put things in writing, can we try to explain things the other way? He's not going to be able to do it. No, I was talking about the immigration judge, whether the immigration judge had to do something else. Right. I mean, the judge did grant a number of continuances. I think that's very clear in the record. But again, I think the thrust of our argument would be that he found that there was a choice made, that he chose not to testify. Mr. Stender, does the record contain any proffer as to what he might have testified to had he been allowed to continue? I'm not aware that it does. I don't think it does, Your Honor. Go ahead. Sorry. No, go ahead. Could I just switch focus a little bit and ask you with respect to the future, does the record contain any indication at all that your client, should he have been returned to India, would be in fact facing the same circumstances that he allegedly faced before? Is this Punjab uprising still going on? Is he going to be subject to the same kind of treatment? Well, the record, of course, doesn't contain new contra-condition reports and that type of evidence since this went up back in 2007, 2008. I mean, there's not much in the record as far as what current contra-conditions are. So, I mean, that Does it show what happened, but does it make it any proffer with respect to the situation at that time, at the time of the hearing? Even at the time of the hearing, things had changed where the uprising was not very strong, but I think an immigration judge does note that the police did arrest a lot of people, that there is torture, there is custodial interrogation using torture as a device to extract confessions. People are singled out for many, many different reasons, illegally and treated very poorly. And the immigration judge does look at those contra-condition reports and give it weight. And I would proffer that most of those same issues are still going on today. But again, they're not in the record, so. Thank you. Thank you. The immigration judge also erred when he looked at the expert witness testimony. There was a Dr. Jane Christmas who testified, a psychologist, and also Patrick Coffey. Both of them testified. You know, basically your time's expired, but I'll give you a minute for rebuttal. Okay, thank you. Thank you. Good morning. Good morning, Your Honors. May it please the Court. John Blakely on behalf of the Respondent Attorney General of the United States. Your Honors, I'd like to direct your attention to page 155 of the administrative record. That's where the colloquy between Mr. Paul's counsel and Mr. Paul occurs, where he acknowledges that what is in the first declaration is, in fact, true and correct. And he had had it read back to him that very day, and that, again, that it was true and correct. And as counsel admitted in his argument here, there's substantial differences between that declaration and the later declaration and his testimony. So your point is this was not simply a fine-tuning, in your view? Well, not only was it not a fine-tuning, Your Honor, but this is something that he affirmed at that time. There's a claim made that this is a product of prior counsel and mistakes that were made by an unscrupulous preparer. Yes. But when he was represented by counsel, he had been with counsel for eight months at that time, on March 23, 2006, when he said, this was read back to me today, and I aver that it is true. And this is my story. And then they proceeded with the merits hearing, and he said, I'm going to rest on what is in that application that I submitted. And this is the declaration that has the substantial differences between later. So it was quite appropriate for the immigration judge to compare the testimony of that and the testimony in the courtroom. One possible, possible inference is that his attorney finally focused on the case and he focused on the case, and his attorney said, look, let's make sure we've got all of this straight. And they went through it and they made changes, and this was the first time he had good, solid counsel going through this with him. Is that a fair inference? That could be a fair inference except for one thing, Your Honor. When he introduces that amended declaration, he tries to slide it under the radar and he says, oh, this is just, they're just grammatical corrections here. There's really nothing of substance. When some of the substantive differences here are pretty dramatic, on whether it's a two- or three-day detention period or whether it's a 30-day detention period where he was transferred to a torture facility, there's also a question of whether he was arrested two times or three times. And one of those was talking, we're talking about, or two of those are in March of 1990. I think most people would be expected to remember whether they were arrested twice in one month and detained for two different periods or whether they were only arrested once and kept for a two-week period. Now, what about there were alleged inconsistencies concerning his travel to Pakistan between 1987 and 1990? Do you think those go to the heart of the asylum claim? And if we were to determine that they did not, are the remaining inconsistencies sufficient to support the agency's denial of relief? Well, Your Honor, first I would say it is related to the heart of the claim, and this is the reason that I would say that. He said that he was, that he was arrested in 1987 and that he was in fear for his life from that point forward. And so, and because of that, he avoided the police. And one of the ways he avoided the police was by moving to Pakistan and then later to Afghanistan. That's part of the evasion that he's trying to actively evade government forces at that time. So I think that's related to the heart of the claim. Even if it is not related to the heart of the claim, the question here is does the record evidence compel reversal of the immigration judge's determination that he's not credible? And here there's substantial evidence to support. In addition to the four things we've talked about there, how many times he was arrested, the length of the detention in 1987, whether he was transferred to a torture center and whether or not he traveled to Pakistan, there are several others that are unrelated to the problematic declaration. And some of those are related to why he was promoted to supervisor, how active he was as a participant with the Khalid al-Parti. And in one case, he said that he was just randomly selected. They came up to him and said, hey, you, why don't you be the supervisor? Another, he said that he was promoted because of his outstanding performance organizing the different party demonstrations. And others, other discrepancies go to whether he was arrested when he was hanging posters at a demonstration or whether he was organizing a group of individuals prior to a demonstration at his home. One, he said he was arrested at his home. That's on page 511 of the record. Another, he says he was arrested hanging posters. That's on page 220 of the record. And, I'm sorry, 225. The other discrepancies relate to whether his finger was broken in 1987 as part of that arrest or whether it was broken during 1990. When you look at this record overall, there is no evidence that compels reversal of the immigration judge's adverse credibility determination. Now, do you think that in terms of, I think one of the things that we explored with Mr. Stender was that what course was available to Mr. Paul if he felt that due to not feeling well at the hearing before the IJ was concluded, could he fully present his case? Was he given the opportunity? And I think Judge Ripple also asked, could he have, he apparently did not tender an offer of proof. Or requested reconsideration. Well, he certainly could have offered, proffered evidence of what he would have presented. But I think it's important to separate out here exactly what we're talking about with the continuance. There's a July 6th, a July 12th, and October 10th, and then a January, I don't have the date, January the following year. There are four different hearings that we're talking about as far as the continuance for health. And during the first three of those, July 6th, July 12th, and the October hearings, the immigration judge was very clear that he was sympathetic to the problems that Mr. Paul was having. And he didn't want to put him into a medical situation that was inappropriate. But starting with the second hearing in July, he made it clear, I need to see something from your doctor that tells me that this is more than just you being really nervous as he told him in July that at the October hearing, he would not continue that because of his health. In spite of that warning, the immigration judge did continue that. And he not only continued it, he continued it until January from an October hearing. Gave him plenty of time and said, if you want to, if you're going to make the same claim in January that you cannot testify because of your health, I need to see something from your doctor that explains that to me. Not something from the doctor that just says, he's having issues, he's under my care. Let's go right at that January hearing when the petitioner stops testifying. At that point, how do we tease out of the record that he really was begging and knowing an intelligent waiver that he was not going to be allowed to continue on another occasion? The judge says, you're going to continue, do you want to stop your testimony now? And he says, yes, and this is after he had said he wasn't feeling well. Is there any indication that he realized at that point that he wasn't going to be allowed to continue the next time? Other than the warning that had been given to him, I don't really think there was. But I think it's important to recognize... Well, it's almost like the IJ is like a parent that says, if you do that one more time, you're going to be in trouble, and they do it one more time and they're not in trouble. And, you know, he keeps getting one more time. Well, and that's true, Your Honor. The immigration judge finally put his foot down. But I think it's also important to recognize here that there's very little that he did not have the opportunity to explain. And at three different points, as far as the inconsistencies between the declaration and the testimony, there are three different points at which Mr. Paul was asked to explain that, 233 of the record, 232, and then 235. Three of the four main discrepancies he was asked to explain. The only one that he wasn't of those four was that whether or not he was transferred to a torture center. Is that the hardest one to explain? Well, that's intimately tied together with the length of the detention, because he said I was arrested and detained for two to three days, during which time I was tortured, or he was arrested for two to three days and then transferred to a torture center. Well, I guess what I'm saying is I'm looking at that as maybe the strongest inconsistency that ‑‑ and so I guess I'm saying, is it your argument, that he took the easy ones to explain, and then when it got hard, he stopped explaining? Well, Your Honor, I think he just provided an explanation that that was those were lies. I had an unscrupulous preparer who put some lies in there, and the immigration judge didn't accept that, because on March 23, 2006, Mr. Paul had said, this is true and accurate, and I have read it just today. And so he really had a chance to explain all of those. His blanket reason for why there would be any discrepancies was the unscrupulous preparer, which was addressed and appropriately rejected by the immigration judge. Now, when you talk about the other indications of credibility, there are four that were identified. Two of those the immigration judge asked specifically. Again, on 222 of the record and 220, he asked related to the ‑‑ and actually, I think this was DHS counsel that asked about these, but whether he was promoted randomly or whether he was promoted because of his performance. You're moving into overtime, so you need to wrap up. Your Honors, the big question here is whether record evidence compels reversal, and the immigration judge made the discrepancies here very clear, and there's no compelling evidence of reversal. I ask this Court to deny the petition for review. Thank you for your argument.
judges: Schroeder, Ripple, Callahan